# United States Court of Appeals
## For the First Circuit

No. 20-1033

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL FREDERICKSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

Leonardo A. Angiulo for appellant.
Lucy Sun, Assistant United States Attorney, with whom Andrew
E. Lelling, United States Attorney, was on brief, for appellee.

February 16, 2021

**LIPEZ**, **Circuit Judge**. In August 2019, the United States Probation Department in Worcester, Massachusetts ("the Probation Office" or "Probation"), petitioned for the arrest of appellant Daniel Frederickson for violating his supervised release by committing a new offense -- assaulting a U.S. Probation Office employee. A criminal complaint was also issued against Frederickson for the alleged assault. After a three-day trial, a jury acquitted Frederickson of the criminal assault charge. Subsequently, the district judge who presided at the jury trial also presided at a supervised release revocation hearing and revoked Frederickson's supervised release on the basis of the same conduct. The court sentenced Frederickson to twenty-four months in prison followed by eight months of supervised release.

Frederickson appeals, alleging that the court improperly used acquitted conduct to revoke his supervised release, that the evidence did not support a finding of revocation, and that the sentence imposed was unreasonable. After careful review, we affirm.

## I.

We recount the facts as presented at Frederickson's revocation hearing in the light most favorable to the government, see United States v. Oquendo-Rivera, 586 F.3d 63, 66-67 (1st Cir. 2009), except where presenting conflicting testimony is necessary to understand the legal issues in this appeal. At the revocation

hearing, the parties relied primarily on transcripts of Frederickson's criminal assault trial. The government supplemented its evidence with two additional witnesses, but Frederickson relied solely on his presentation at trial, which consisted of his testimony as the only witness in his defense. Hence, in recounting the facts, we rely heavily on memorialized trial testimony as proffered by the parties and supplemented by the government at the revocation hearing.

## A. Supervised Release and the Assault

In November 2017, Frederickson pled guilty to conspiracy to possess with intent to distribute steroids, in violation of 21 U.S.C. § 846, and possession of a tableting machine, in violation of 21 U.S.C. § 843(a)(6). He was sentenced to three years of supervised release. As a condition of his release, Frederickson was required to submit to regularly scheduled drug testing at the U.S. Probation Office. He was also prohibited from committing any additional state or federal crimes.

Paul Walter, who was twenty-six years old at the time of these events, was a student intern in the Probation Office beginning in January 2017. As an intern, he was responsible for, among other things, answering the phone, handling faxes, monitoring home detention, and collecting urine samples. Walter testified that, beginning in late 2017, he collected urine samples from Frederickson one to three times a month until August 20, 2019.

On that date, Frederickson arrived at the Probation Office for a scheduled urine test. Walter greeted Frederickson, observed him pass through a metal detector, and unlocked the bathroom door for Frederickson to enter from the lobby. Walter then entered the bathroom from a second door leading to the offices, handed Frederickson a urine sample cup, and left the bathroom through that same door to allow Frederickson to provide the sample. Shortly thereafter, Frederickson either knocked on the door to the offices or yelled for Walter to reenter the bathroom. Walter and Frederickson provided conflicting accounts of what happened next.

Walter contends that when he reentered the bathroom, he inspected Frederickson's sample and determined that there was an insufficient amount of urine. Walter asked whether Frederickson needed additional time or a glass of water to produce a sufficient sample, but Frederickson declined. Walter testified that Frederickson suddenly began walking toward him and asking questions such as "Why are we here?" and "What do you even do here?" Walter tried to leave the bathroom but was met by a closed fist punch to the left side of his face by Frederickson. Walter contends that Frederickson proceeded to violently assault him by placing him in a chokehold, strangling him, and slamming his head against a wall, table, and the floor while Walter pleaded for his life.

According to Frederickson, when Walter initially entered the bathroom to provide the sample cup, Walter made several comments about Frederickson's appearance, such as, "[y]ou look good," and "you have really nice calf muscles," and asked Frederickson whether he had been working out. Frederickson testified that he felt as though Walter was "hitting on [him]." According to Frederickson, when Walter reentered the bathroom to inspect the sample, he said it was insufficient and proceeded to "pat" Frederickson's genitals, and stated "you can do a little better than that." Frederickson said he was "stunned" by Walter's sexual assault and immediately punched Walter in his left eye. Frederickson contends that thereafter he was in a state of shock and remembers only that he ended up on the bathroom floor holding Walter down by his shoulders and asking him "What the hell was that?" and "What do you even do here?"

The only other individual present in the Probation Office at the time of the assault was Probation Officer Ryan Skal, who testified at the trial that he heard a loud thumping coming from the bathroom and went to investigate. When he opened the bathroom door, Officer Skal observed Frederickson holding Walter in a chokehold on the floor. He testified that Walter appeared to be struggling to breathe. He closed the bathroom door and ran to call for emergency services. After calling 911 and reporting the assault, Officer Skal returned to the bathroom and observed

Frederickson continuing to strangle Walter. Skal urged Frederickson to desist and, "after a few prompts," Frederickson acquiesced. Officer Skal then ordered Frederickson to leave the Probation Office immediately, and Frederickson complied. Officer Skal did not testify that Frederickson had told him that Walter had sexually assaulted him.

After Frederickson left the Probation Office, Worcester Police Officer Keith Garlick recognized Frederickson's name because he was "familiar with the family." Officer Garlick notified Frederickson's family of the assault allegations and, shortly thereafter, Frederickson's sister drove him to the Worcester Police Station. Officer Garlick testified, as one of the two additional witnesses presented by the government at the revocation hearing, that he arrested Frederickson without Mirandizing[1] him and that Frederickson remained silent and had no visible injuries.

## B. The Jury Verdict and Supervised Release Revocation

Frederickson was indicted on one count of assaulting a federal employee, in violation of 18 U.S.C. § 111. The Worcester District Court had also issued a criminal complaint charging Frederickson with various state crimes, but all were dismissed after Frederickson was federally indicted. The Probation Office

---

[1] See Miranda v. Arizona, 384 U.S. 436, 444-45, 467-74 (1966).

separately sought revocation of Frederickson's supervised release for his November 2017 offense on the ground that Frederickson had violated the conditions of his release by "committ[ing] another federal, state, or local crime."  At the government's request, the court continued the revocation hearing until after the assault trial.

The trial occurred in December 2019 and lasted three days.  On the final day, the court instructed the jury on the elements of forcibly assaulting a federal employee.  The court also instructed the jury on self-defense:

> The defendant has testified that he acted in self-defense.  Therefore, in addition to proving all the elements of the crime beyond a reasonable doubt, the [g]overnment must also prove beyond a reasonable doubt that the defendant did not act in self-defense.  A defendant may use force in self-defense against a federal officer if: One, the defendant reasonably believed that the use of force was necessary to defend himself against an immediate use of unlawful force or unlawful contact; and two, the defendant used no more force than appeared reasonably necessary in the circumstances.  However, a person who is the initial aggressor cannot later claim self-defense as a justification for the assault.

After approximately three hours of deliberations, the jury returned a verdict of not guilty.

Directly following the acquittal, the court convened a bail hearing regarding Frederickson's ongoing detention for his alleged supervised release violation based on the same conduct --

assaulting Walter. Despite the acquittal, the government insisted on pursuing the supervised release violation, given the lower burden of proof (by a preponderance of the evidence) applicable at revocation proceedings. The court ordered Frederickson detained pending the revocation hearing.

The day before the revocation hearing, the court convened a telephone conference primarily to hear argument as to "whether the court may consider acquitted conduct in reaching its decision on revocation." At that hearing, the government notified Frederickson that it intended to argue at the revocation hearing that Frederickson violated supervised release by (1) assaulting a federal employee in violation of 18 U.S.C. § 111 (the federal assault charge that was the subject of the criminal trial), and (2) committing simple assault and battery in violation of Mass. Gen. Laws ch. 265, § 13A (the state assault and battery charge that was dismissed).

The revocation hearing was held on December 20, 2019. At the outset, the court announced its legal conclusions as to the issues discussed at the telephone conference. The court concluded that nothing "prevent[ed] [it] from considering whether the defendant violated 18 U.S.C. [§] 111 under a preponderance of the evidence standard, and on that basis [the court could revoke Frederickson's] supervised release." The court further concluded

that it could also consider whether Frederickson's conduct violated state or local law.

Frederickson argued that he acted in self-defense, relying on his memorialized trial testimony. The government similarly relied on the evidence it presented at trial, which consisted of photographic evidence of Walter's injuries and the crime scene, Walter's medical records, and the testimony of four witnesses -- Walter; Officer Skal; Officer Anthony Correa, who responded to the 911 call at the Probation Office; and Barbara Hazen, a receptionist at the Probation Office who did not witness the assault but arrived at the office shortly after the assault occurred. The government supplemented its evidence at the revocation hearing with the live testimony of two additional witnesses: (1) Officer Keith Garlick, who testified that Frederickson had no visible injuries and did not report being sexually assaulted; and (2) Alicia Howarth, a Probation supervisor who testified that Walter's employment file contained no disciplinary proceedings or allegations of sexual assault.

After orally reviewing the evidence, the court stated that it "intend[ed] to use the self-defense instruction, the law that [it] gave the jury in the trial." It further clarified that it had assessed the evidence and would apply the preponderance of the evidence standard. The court proceeded to announce its findings on self-defense before turning to the elements of assault.

Regarding self-defense, the court concluded that "the government ha[d] met its burden [of demonstrating] by a preponderance of the evidence that the defendant did not act in lawful self-defense [because] . . . [e]ven if the defendant believed that Paul Walter unlawfully had physical contact with him, the defendant used more force than appeared reasonably necessary in the circumstances."  The court noted that the only unlawful physical contact that Frederickson testified to was Walter's sexual assault at the beginning of the encounter, which the court found did not justify Frederickson's prolonged retaliation.  With respect to the alleged sexual assault, the court noted that

> there [was] just no reason for Mr. Frederickson not to say to Officer Skal or to anyone that night "I was sexually assaulted. . . . I'm on top of him because he assaulted me" . . . .  Mr. Frederickson remained without any sort of responsiveness and didn't mention to Officer Garlick, who apparently knows the family, "Officer Garlick, I was sexually assaulted" and talk to him, tell him that.  Nothing.  There was nothing that was mentioned.

Turning to the elements of assault and battery, the court held that there, too, the government had met its burden on each element of 18 U.S.C. § 111 and Mass. Gen. Laws ch. 265, § 13A.  It concluded that Frederickson willfully touched Walter in an offensive manner likely to cause bodily harm.  The court noted that "Mr. Walter testified that Mr. Frederickson began to make him

- 10 -

feel uneasy in terms of the questions and the look on his face, and then out of the blue, according to Mr. Walter," Frederickson struck him.  The court stated that it found that the assault had occurred "by a preponderance" and "frankly [that it was] undisputed[,] because Mr. Frederickson admitted that he sucker punched Mr. Walter."

The court revoked Frederickson's supervised release and imposed the maximum allowable sentence -- twenty-four months in prison followed by eight months of supervised release.

## II.

On appeal, Frederickson challenges the revocation of his supervised release as well as the sentence imposed by the district court.  Specifically, he argues that: (1) the district court was barred from relying on acquitted conduct to revoke his supervised release; (2) even if the acquitted conduct could be used, the record does not support a finding of revocation; and (3) the sentence imposed is unreasonable.

### A.  Acquitted Conduct as a Basis for Revocation

Frederickson contends that the government was collaterally estopped from relying on acquitted conduct to demonstrate that he committed a crime in violation of the terms of his supervised release.  As noted, prior to the revocation hearing, the court conducted a telephonic hearing to consider whether acquitted conduct could be used at the revocation hearing.  Hence,

we review this preserved issue of law de novo.  United States v. Cruz-Rivera, 904 F.3d 63, 65 (1st Cir. 2018).

The Fifth Amendment guarantee against double jeopardy bars the government from retrying an individual for the "same" offense.  U.S. Const. amend. V.  In Ashe v. Swenson, the Supreme Court identified collateral estoppel as an "ingredient" in the Fifth Amendment's prohibition on double jeopardy.  397 U.S. 436, 442-46 (1970).  In effect, collateral estoppel applies the principles of double jeopardy to a subsequent prosecution of a "different" offense if, "to secure a conviction[,] the prosecution must prevail on an issue the jury necessarily resolved in the defendant's favor in the first trial."  Currier v. Virginia, 138 S. Ct. 2144, 2150 (2018).  For Ashe's collateral estoppel bar to apply, "[the court] must be able to say that 'it would have been irrational for the jury' in the first trial to acquit without finding in the defendant's favor on a fact essential to conviction in the second."  Id. at 2150 (quoting Yeager v. United States, 557 U.S. 110, 127 (2009) (Kennedy, J., concurring in part and concurring in the judgment)).

We recognize that there is a broader argument that collateral estoppel, as grounded in the Double Jeopardy Clause, simply does not apply to revocation proceedings, which often entail a loss of liberty but are not criminal prosecutions.  See United States v. Correa-Torres, 326 F.3d 18, 22 (1st Cir. 2003).  Indeed,

the Tenth Circuit has stated that a "revocation proceeding . . . simply is not a criminal prosecution to which Double Jeopardy protections apply." Lynch v. O'Dell, 163 Fed. App'x 704, 707 (10th Cir. 2006). The government attempts, in a perfunctory manner, to raise a similar argument. Even if we excused the government's probable waiver of this argument, we would decline to reach it, opting instead for affirmance on the narrow ground that collateral estoppel, assuming it applies, does not bar the government's use of acquitted conduct in this case.[2]

Although we have not previously addressed whether collateral estoppel prohibits the use of acquitted conduct to revoke supervised release, we do not write on a blank page. In United States v. Watts, the Supreme Court held that "an acquittal in a criminal case does not preclude the [g]overnment from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." 519 U.S. 148, 156 (1997) (per curiam) (quoting Dowling v. United States, 493 U.S. 342, 349 (1990)). In Watts, the police discovered cocaine base and two

---

[2] Apparently concerned that we might rule otherwise -- that the Double Jeopardy Clause barred the government's use of acquitted conduct to seek revocation -- the government, for the first time on appeal, invokes the dual sovereignty doctrine to argue that double jeopardy does not apply at all because the government sought revocation on the basis of Frederickson's simultaneous violation of state law. Since we are only assuming that collateral estoppel, grounded in the Double Jeopardy Clause, applies here, we need not consider the government's dual sovereignty argument.

loaded guns in the defendant's home. Id. at 149. A jury convicted the defendant of possession with intent to distribute but acquitted on the charge of using a firearm in relation to a drug offense. Id. at 149-50. At sentencing, the district court nevertheless found by a preponderance of the evidence that the defendant had used the guns in connection with the drug offense and, therefore, was subject to an increased sentence. Id. at 150.

The Ninth Circuit vacated Watts' sentence and remanded for resentencing. United States v. Watts, 67 F.3d 790, 796-98 (9th Cir. 1995). The circuit court reasoned that, although a district court can consider conduct "other than that of which a defendant was convicted" in calculating a sentence, it could not "reconsider facts that the jury necessarily rejected by its acquittal of the defendant on another count." Id. at 796.

The Supreme Court reversed, concluding that the Ninth Circuit "failed to appreciate the significance of the different standards of proof that govern at trial and sentencing," and "misunderstood the preclusive effect of an acquittal" when it held that the government was barred from relitigating the acquitted gun charge at sentencing. Watts, 519 U.S. at 155. The Court explained that "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge" in the absence of specific factual findings. Id. An acquittal, the Court reasoned, does not establish that the jury rejected any facts or concluded that the

- 14 -

defendant was innocent of the charged conduct; it establishes only that the government failed to prove an essential element of the offense beyond a reasonable doubt. Id. Hence, the Court concluded, the jury's acquittal on the gun charge did not "preclude a finding by a preponderance of the evidence," at sentencing, "that the defendant did, in fact, use or carry . . . a weapon . . . in connection with a drug offense." Id. at 157. In other words, collateral estoppel did not bar the district court's examination of the acquitted conduct in light of the lower burden of proof. See id.

The subsequent proceeding here, a revocation hearing, is similarly governed by a lower standard of proof. To prove Frederickson violated the terms of his supervised release, the government needed only to show by a preponderance of the evidence that he committed a crime while on supervised release. See, e.g., United States v. Marino, 833 F.3d 1, 8 (1st Cir. 2016). Applying the straightforward logic of Watts, we conclude, as have several of our sister circuits, that the government's use of acquitted conduct to prove assault by a preponderance of the evidence at revocation does not violate principles of collateral estoppel. See, e.g., United States v. Waller, 616 Fed. App'x 628, 629 (4th Cir. 2015) (holding that "[b]ecause the standard of proof is less than that required for a criminal conviction," a district court may revoke supervised release "even if the defendant is acquitted

- 15 -

on criminal charges arising from the same conduct"); Poirier v. Doyle, 40 Fed. App'x 211, 213 (7th Cir. 2002) (allowing the "revocation of parole [even when] based on criminal conduct for which the defendant was acquitted"); see also United States v. Teran, 98 F.3d 831, 836 (5th Cir. 1996) ("Regardless of [the defendant's] acquittal by a jury, the revoking court had a preponderance of evidence before it to support the finding of th[e] probation violation."); United States v. McPherson, 814 F. App'x 957, 962 (6th Cir. 2020) (similar); Standlee v. Rhay, 557 F.2d 1303, 1305-06 (9th Cir. 1977) (similar).

Frederickson nevertheless argues that where, as here, the acquitted conduct is the sole basis for a deprivation of liberty rather than a factor in determining the degree of punishment at sentencing, Watts is inapplicable and collateral estoppel should apply. However, Frederickson misunderstands the liberty interests at stake in a revocation hearing. Although revocation often leads to reimprisonment, and thus "entail[s] a loss of freedom and a deprivation of liberty," it is not considered an independent criminal prosecution. Correa-Torres, 326 F.3d at 22. Revoking supervised release deprives an individual "only of [] conditional liberty" dependent upon observing the restrictions imposed by the district court as a condition of release from imprisonment for the earlier criminal conviction. See Morrissey v. Brewer, 408 U.S. 471, 480 (1972). For that reason, the grounds

- 16 -

for revocation "need only be found by a judge under a preponderance of the evidence standard, not by a jury beyond a reasonable doubt." Johnson v. United States, 529 U.S. 694, 700 (2000).

Frederickson also contends that Watts is inapplicable because a conclusive finding of self-defense can be gleaned from the jury's verdict. He argues that, because he conceded that he assaulted Walter -- though he disputes the severity of the assault -- the only explanation for the jury's verdict of not guilty is that he prevailed on his theory of self-defense.

Assuming arguendo that the jury's verdict was based on self-defense, which, as we have explained, is impossible to know conclusively, see Watts, 519 U.S. at 155, Frederickson's argument would still fail because of the differing burdens of proof. At trial, Frederickson initially was required only to proffer evidence of self-defense that could support a reasonable jury finding in his favor. See United States v. Bello, 194 F.3d 18, 27 (1st Cir. 1999) (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)). Having met that low threshold, Frederickson was then entitled to the instruction that the court gave, as we quoted in Section I(B): that the government had the burden of disproving self-defense beyond a reasonable doubt. See United States v. Wilk, 572 F.3d 1229, 1237-38 (11th Cir. 2009); Pattern Criminal Jury Instruction for the District Courts of the First Circuit § 5.04 (1997); see also Tr. of Jury Trial Day 3 at 34, United States v.

Frederickson, 4:19-cr-40039-LBM-1 (Dec. 1, 2019). Applying the reasoning of Watts, the verdict for Frederickson only meant that the government failed to disprove self-defense beyond a reasonable doubt. The government faced a different, lesser burden at the revocation hearing: disproving self-defense by a preponderance of the evidence. See 18 U.S.C. § 3583(e)(3); see also Watts, 519 U.S. at 155-57.

Frederickson also invokes principles of fundamental fairness to argue that collateral estoppel should apply because the court, at the government's request, delayed the revocation proceeding until after the criminal trial, allowing the government to get the proverbial "second bite at the apple." This argument misapprehends the dual effect of new criminal conduct committed while on supervised release. In addition to running afoul of a criminal statute, the offending conduct simultaneously and independently violates the terms of release for the initial offense. See United States v. McInnis, 429 F.3d 1, 5 (1st Cir. 2005). The government is entitled to pursue both a new criminal conviction and revocation as "part of the penalty for the initial offense." Id. In doing so, nothing compels the government to choose a particular sequence because a violation of supervised release does not depend upon whether the violative conduct is the subject of a criminal charge or conviction. U.S. Sent'g Guidelines Manual § 7B1.1, cmt. 1 (U.S. Sent'g Comm'n 2018) (explaining how

to calculate the grade of a supervised release violation). Practically speaking, the government may seek to secure a criminal conviction first because, once it has proven that the defendant committed a new crime beyond a reasonable doubt, that conviction necessarily demonstrates by a preponderance of the evidence at revocation that the defendant violated the terms of supervised release by committing a new crime.

Frederickson nevertheless urges us to adopt the reasoning of Commonwealth v. Brown, 469 A.2d 1371 (Pa. 1983), a case that predates Watts, in which the Supreme Court of Pennsylvania concluded that Pennsylvania law reflects a "clear assumption" that when a revocation hearing is delayed until after a criminal trial based on the same conduct, "the [government] will be bound by the finding of the criminal trial" at the revocation hearing. Id. at 1376-78. Pennsylvania law obviously does not apply in this case, and Frederickson does not point to any similar assumption in federal law. Indeed, as we have explained, nothing prohibits the government from seeking, in no particular order, to hold a defendant accountable for both committing a new criminal offense and violating a term of supervised release.

Lastly, Frederickson argues that delaying his revocation hearing until after his trial deprived him of procedural due process. Frederickson misunderstands the procedures due him prior to revoking his supervised release. In the context of revocation,

procedural due process is satisfied if, in a timely manner, the defendant is afforded,

> (A) written notice . . . ; (B) disclosure of the evidence against [him]; (C) an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear; (D) notice of [his] right to . . . counsel . . . ; and (E) an opportunity to make a statement and present any information in mitigation.

Fed. R. Crim. P. 32.1(b)(2). Frederickson does not argue that he was deprived of any of those procedural protections. Moreover, at Frederickson's revocation hearing, which occurred less than five months after the assault on Walter, the court relied, almost exclusively, on evidence proffered and examined at trial. In effect, then, Frederickson received much more than due process requires at revocation: he received all of the due process protections that come hand-in-hand with a criminal trial on the merits. Frederickson's due process argument fails.

## B. Sufficiency of the Evidence

Frederickson contends that even if acquitted conduct can be used to revoke supervised release, the evidence presented by the government was insufficient to prove, by a preponderance of the evidence, that he committed an assault and was not acting in self-defense. We review a district court's decision to revoke supervised release for abuse of discretion and factual findings supporting that decision for clear error. Oquendo-Rivera, 586

F.3d at 66-67.  As we have previously recognized, sufficiency challenges to supervised release revocations are "notoriously hard to win," because (1) we must view the evidence in the light most favorable to the government, (2) the district court's choice among competing, yet plausible, inferences from the evidence does not amount to clear error, and (3) credibility determinations are primarily for the district court.  Marino, 833 F.3d at 8.

The district court concluded that Frederickson did not act in lawful self-defense when he assaulted Walter because "[e]ven if [Frederickson] believed that Paul Walter unlawfully had physical contact with him, [Frederickson] used more force than appeared reasonably necessary in the circumstances."  Frederickson contends that the record does not support the severe, protracted assault described by the court.  Frederickson points to inconsistencies between Walter's testimony, Officer Skal's testimony, and Walter's medical records.  He also questions the district court's reluctance to credit his claim of sexual assault.

At trial, Walter testified that the assault began with a closed fist punch delivered by Frederickson to Walter's left eye.  He then described the ensuing altercation as follows:

> Mr. Frederickson grabbed me in a front chokehold, slammed my head against the wall, the table, and eventually to the floor. . . . As I was kicking the door and I still had air to speak, I was screaming for help, kicking the door, the floors, walls, in an attempt to make any noise so somebody could hear

me. . . . I felt a lot of pain and kind of, I guess, shock. . . . I was being strangled against my will . . . . [I said] You're going to kill me. . . . I told [Officer Skal] "Get him off me. He's going to kill me." . . . Officer Skal left the bathroom. . . . At this point I had pretty much given up that anybody was going to be in the office. . . . My body began to not tense up as much, and I kind of accepted that I might be breathing my last breath underneath that toilet. . . . Some time later [Officer Skal] came [back] . . . . Mr. Frederickson was still on top of me. Officer Skal told him to "Get off him," and Mr. Frederickson eventually complied with that. . . . [After Frederickson left,] I attempted to get up . . . . I got out towards the lobby door, crawling. I then attempted to stand up, and I fell over and slammed my head against the wall in the lobby.

Walter testified that when he went to the hospital, he was experiencing severe symptoms:

[His] face felt extremely swollen . . . [his] jaw [felt] broken. [He] couldn't really open [his] left eye. [His] leg was extremely strained. [He] couldn't really walk. [His] neck was strained . . . . [He] had a cut in . . . [his] back [and] head and swelling of the back of [his] head.

He further testified that he told the doctors that he had sustained a punch to the face with a closed fist, he was strangled, his leg hurt, his face was swollen, and he had a headache.

Frederickson points to notes in the emergency room doctor's medical report indicating that Walter was negative for neck pain, skin wounds, dizziness, trouble swallowing, nosebleeds, nausea, change in vision, and headaches, as support for his

argument that the assault was not as severe as Walter claimed at trial. Although there were small discrepancies in the report vis-á-vis Walter's testimony, the medical records in their totality support Walter's description of a severe assault. The records identify Walter's reason for visiting the emergency room as an "assault[] while at work . . . in locked bathroom, [patient] was punched to [left] side of face, slammed down on the ground, hit [right] side of face, strangled [for] 'a couple minutes.'" The records further state that Walter presented as "assaulted by client, was choked and struck with fist on left jaw," reported pain in his jaw and leg, was positive for facial swelling, and contusions of the head and face. Moreover, the court placed considerable weight on the photographs of Walter's injuries and of blood on the wall after the altercation. The court also found the corroborating testimony of Officer Skal "utterly credible."

Officer Skal's testimony did corroborate Walter's description of the assault in all major respects. Specifically, Officer Skal testified that he heard thumping in the bathroom, opened the bathroom door, saw Frederickson on top of and choking Walter, perceived the situation as "extremely dangerous," and immediately retreated to call 911. The assault then continued while Officer Skal left the bathroom, called 911, reported the assault, and entered the bathroom a second time to observe Frederickson still on top of Walter. Officer Skal further

testified -- and Officer Garlick later corroborated -- that Frederickson had no visible injuries following the altercation.

Frederickson points to several inconsistencies in the testimony of Walter and Officer Skal: (1) Walter said the reason Officer Skal entered the bathroom was that Walter was screaming for help and kicking the door, floor, and wall, while Officer Skal testified that it was because he heard a "thumping sound, almost like a bowling ball hitting a marble floor"; (2) Walter testified that his head was under the toilet when Officer Skal entered the bathroom, while Officer Skal testified that Walter's head was "positioned almost under the sink"; (3) Walter testified that he and Frederickson were in the same spot when Officer Skal returned the second time, while Officer Skal testified that "[t]hey were not . . . [and Walter's] body was a little bit more upright"; and (4) Walter testified that he got out of the bathroom by crawling out of the door and into the lobby covered in blood, while Officer Skal testified that he helped Walter out of the bathroom.

The minor inconsistencies cited by Frederickson do not undermine the court's determination that the combined testimony of Walter and Officer Skal supported Walter's version of events. The court explained that Officer Skal "was there. He heard what was happening. He opened the door twice, and both times saw [Mr.] Walter being assaulted in a manner consistent with Mr. Walter's testimony." As we have explained, credibility determinations are

primarily for the district court, Marino, 833 F.3d at 8, and the court resolved the inconsistencies cited by Frederickson by explaining, "I think both Officer Skal and Walter [we]re [] in shock on some level, and so the fact that they might not remember certain details about the way the legs were and the arms were flailing during the assault, that in the [c]ourt's view, is understandable."

Frederickson also contends that the court erred in doubting his allegation of sexual assault primarily because he failed to report the assault. Frederickson faults the court for "speculating" and "prescrib[ing]" how he should have processed the assault. At the revocation hearing, the court concluded that it could discern no reason for Frederickson's failure to tell Officer Skal or Officer Garlick that he was sexually assaulted, or to otherwise report Walter for such a serious offense. As we describe in more detail when discussing the reasonableness of Frederickson's sentence, the court's skepticism regarding Frederickson's alleged failure to report was but one factor supporting its conclusion that Frederickson lacked credibility.[3]

_____

[3] See, e.g., Reyes v. Mitchell, 2020 WL 1550238, No. 18-40147-WGY, slip op. at 10-13 (D. Mass. Apr. 1, 2020) (explaining that a delay or failure to report a sexual assault can be used to impeach a witness' credibility). That is not to say, however, that a delay or failure to report should be viewed uncritically as the sole basis for disbelieving a victim of sexual assault. Indeed, research shows that sexual assault victims "experience a range of conduct, suffer a range of harms, [] respond [to assault] in

- 25 -

Viewing the evidence in the light most favorable to the government, as we must, we conclude that the district court's finding that Frederickson assaulted Walter in excess of the bounds of lawful self-defense is not clearly erroneous and, therefore, the court did not abuse its discretion in revoking Frederickson's supervised release.

## C. Reasonableness of the Sentence

Frederickson claims that the court erred in imposing an unreasonably long sentence based on improper sentencing factors and without resolving critical factual conflicts. We review a district court's chosen sentence for abuse of discretion. United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011). The "touchstone" of our review is reasonableness, which may involve both procedural and substantive inquiries. Id.

In assessing procedural unreasonableness, we ask whether the court made any procedural errors during the sentencing phase, such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence

---

divergent ways," and may choose not to report or to delay reporting because they feel responsible, embarrassed, ashamed, or for a variety of other reasons. See, e.g., Jamie R. Abrams, The #METOO Movement: An Invitation for Feminist Critique of the Rape Crisis Framing, 52 U. Rich. L. Rev. 749, 772-776 (May 2018); see also Kathryn M. Stanchi, The Paradox of the Fresh Complaint Rule, 37 B.C.L.R. 441, 459-462 (May 1996).

based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008) (quoting Gall v. United States, 522 U.S. 38, 51 (2007)). If no procedural errors have been committed, and the appellant is arguing substantive unreasonableness, we ask whether the district court provided a "plausible" explanation for its sentencing determination and whether, based on the totality of the circumstances, the overall result is "defensible." United States v. Innarelli, 524 F.3d 286, 292 (1st Cir. 2008).

Frederickson says that he is challenging only the substantive reasonableness of his sentence but, as the government notes, two of his arguments -- that the court failed to consider all appropriate sentencing factors and failed to resolve critical factual issues -- raise procedural concerns. See Politano, 522 F.3d at 72. Hence, we begin our review of the alleged procedural errors with a brief overview of Frederickson's sentencing hearing.

The court began its sentencing explanation by stating that the applicable guidelines range of twelve to eighteen months in prison was insufficient, and that Frederickson's conduct warranted an upward variance to the maximum allowable sentence. The court remarked that it viewed even that sentence -- twenty-four months in prison and eight months on supervised release -- to be inadequate, but the sentence could not exceed the statutory

maximum. The court proceeded to explain that it had considered all relevant factors, including the nature and circumstances of the violation as well as Frederickson's criminal history and personal characteristics, and determined that a statutory maximum sentence was not greater than necessary.

The court outlined the two primary goals served by its sentence: general deterrence and public protection. The court explained that a severe sentence was warranted to deter others from assaulting members of the U.S. Probation Office while on supervised release, which is designed to help federal prisoners reintegrate into society. The court also noted that Frederickson's history of violent crime and his two previous violations of supervised release within the prior year -- one for assaulting his parents and one for participating in an unarmed robbery -- made him a "menace" and a danger to the public. According to the court, by committing yet another offense while on supervised release, Frederickson "thumbed [his] nose at the [c]ourt, at Probation, and at law enforcement" and demonstrated that he could not be trusted to comply with the terms of continued supervised release.

Frederickson contends that the court's focus on those two goals demonstrates that the sentence was improperly driven by a vindictive motive and that the court failed to take mitigating factors into account. We disagree. Frederickson points to nothing in the court's sentencing colloquy that demonstrates an improper

motive.  See United States v. Pimienta-Redondo, 874 F.2d 9, 13 (1st Cir. 1989) ("Absent proof of an improper motive -- or some sound reason to suspect the existence of one -- no reasonable apprehension of vindictiveness can flourish.").  To the contrary, the court explained that it had considered each of the factors prescribed by statute for determining the appropriate sentence for a violation of supervised release, which include "the history and characteristics of the offender; the nature and circumstances of the new offense; the need to deter further criminal conduct; and the need to protect the community from the offender's penchant for criminal behavior."  United States v. Márquez-García, 862 F.3d 143, 145 (1st Cir. 2017) (citations omitted); see also 18 U.S.C. §§ 3583(e), 3553(a).[4]

The court further explained that it had reviewed all of the information submitted by both parties, including factual objections and legal arguments, Walter's victim impact statement, Frederickson's supervised release violation report, the parties' sentencing memos, and the letters of support from Fredrickson's family and friends.  The court even remarked that the letters submitted on Frederickson's behalf, which, according to the court, portrayed someone very different from the person described in the

---

[4] Section 3583(e) directs a district court to consider the sentencing factors set forth in § 3553(a) in determining whether to modify or revoke a defendant's supervised release.

violation report, provided a glimmer of hope that Frederickson may receive familial support upon his release from prison.

That the court chose to highlight only two factors in more detail -- deterrence and public protection -- does not undermine the "significant weight" we afford a court's statements regarding the factors and information it considered at sentencing. Márquez-García, 862 F.3d at 145 ("Although a sentencing court must consider each of the factors that section 3583(e) identifies, the court is not obliged to address these factors 'one by one, in some sort of rote incantation when explicating its sentencing decision.' Rather, the court need only identify the principal factors upon which it relies to reach its sentencing decision." (citations omitted) (quoting United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006))); United States v. Santiago-Rivera, 744 F.3d 229, 233 (1st Cir. 2014) ("[T]he sentencing judge explicitly noted that he had considered all of the section 3553(a) factors. Such a statement is entitled to significant weight . . . .").

Frederickson also claims that the court failed to resolve factual conflicts regarding the impetus, nature, and extent of the assault. According to Frederickson, the court failed to adequately explain which version of events it found credible and, therefore, the lengthy sentence it imposed is not supportable. Here, too, we disagree. Immediately prior to sentencing, while revoking Frederickson's supervised release, the court explained

that it found the testimony of Walter "credible by a preponderance of the evidence" and the testimony of Officer Skal "utterly credible." It further concluded that Frederickson's conduct reflected that he had a "serious issue, a serious problem" and that he did not act in lawful self-defense when he assaulted Walter.

As Frederickson points out, the court's statements do not include an explicit finding that Frederickson was not credible or that he lied about being sexually assaulted by Walter. Nevertheless, we read the court's findings as a rejection of Frederickson's version of events. As noted, the court began its findings by expressing considerable skepticism regarding Frederickson's testimony, discerning "no reason for Mr. Frederickson not to say to Officer Skal or to anyone that night that . . . 'I was sexually assaulted. . . . I'm on top of him because he assaulted me.'" The court further commented that the evidence showed that "Mr. Frederickson remained without any sort of responsiveness and didn't mention to Officer Garlick, who apparently knows the family, 'Officer Garlick, I was sexually assaulted' and talk to him, tell him that. Nothing. There was nothing that was mentioned." The court went on to carefully explain how, in its view, virtually all of the evidence corroborated Walter's version of events. It explicitly found

Walter's testimony, as corroborated by the only eyewitness, Officer Skal, credible and supportable.

The court further described Frederickson's conduct as "gravely concerning," and it concluded that Frederickson had proven "that [he] cannot be trusted to comply with the terms and conditions of supervision." The court stated that "if [it] could order [him] to be locked up for longer, [it] would" because "[t]he public deserves that[,] Paul Walter deserves that[,] [e]very probation officer deserves that." The court warned Frederickson that "if you come before this [c]ourt ever again and if you lay hands on one other person, you will not get probation and interactive journaling. No. You will get the sentence that you deserve."[5]

Juxtapose those statements with the court's praise of Walter's work as a Probation intern "working with [Frederickson,] supervising [his] drug testing," "engaging with [him] in interactive journaling," and "working with [him] to help [him] integrate into society, become law-abiding." Indeed, speaking directly to Walter, the court said:

> You must not turn away from a career in criminal justice based on this hideous experience. . . . You became a victim because of your service, because of your courage, and

_____

[5] Interactive journaling is a "cognitive behavioral treatment approach" in which a member of the Probation Office assists ex-convicts with journaling to help "[i]dentify [their] thoughts and actions leading to behaviors."

I hope you redouble your efforts. I trust that you will have support along the way. You did not deserve this, sir, but thank you for your service.

In short, the court's statements reflect an adoption of Walter's version of events, which necessarily entails a rejection of Frederickson's allegation of sexual assault. Contrary to Frederickson's assertions, the court did not leave unresolved a critical factual dispute between Walter and Frederickson and, thus, we discern no procedural unreasonableness with Frederickson's sentence.

Turning to substantive reasonableness, we must consider whether the challenged sentence falls within the "expansive 'universe of reasonable sentencing outcomes.'" United States v. Díaz-Lugo, 963 F.3d 145, 157 (1st Cir. 2020) (quoting Clogston, 662 F.3d at 592). In doing so, we may not substitute our own judgment for the judgment of the sentencing court. Id. "[A]s long as the sentencing court has mulled all the relevant factors," and reached a defensible result, Frederickson cannot prevail by merely complaining about the court's assessment of those factors. Id.

As explained above, the court considered each of the statutory factors, see 18 U.S.C. §§ 3583(e), 3553(a), finding that Frederickson committed a serious violent offense, had a proclivity for recidivism, and was a danger to the public. The court weighed

the last two factors the heaviest, concluding that Frederickson was a menace and that his two prior supervised release violations demonstrated a lack of appreciation for the terms of supervised release and the judicial system as a whole. The circumstances of Frederickson's prior violations support the court's conclusion.

In March 2018, Frederickson pled guilty to assaulting both of his parents. Following an argument, Frederickson violently pushed them both to the ground and caused his father to flee the home. His parents were both granted emergency restraining orders. Frederickson was found in violation of his supervised release and sentenced to time served, followed by twenty-four months of supervised release.

Frederickson was found in violation of supervised release again in October 2018. While responding to a report of an unarmed robbery of a woman in Worcester, a police officer identified and pulled over a suspected vehicle. Frederickson was driving the vehicle, and the woman's purse, which contained a bottle of unspecified pills, was found inside. He was sentenced to four months' imprisonment, followed by twelve months of supervised release.

Given the violent circumstances of this offense and the court's explicit consideration of Frederickson's prior supervised release violations, we conclude that the court applied the appropriate sentencing factors, provided a plausible rationale for

its judgment, and imposed a defensible sentence based on its supportable view of the facts. Frederickson's sentence was substantively reasonable.

Affirmed.

- **DISSENTING OPINION FOLLOWS -**

**BARRON**, **Circuit Judge**, **dissenting.** The majority concludes that the District Court implicitly found that Daniel Frederickson was not telling the truth about what had been done to him right before he violently lashed out at the probation officer who was overseeing his drug test, see Slip Op. at 32, and that the District Court relied on that implicit finding to justify its decision to revoke Frederickson's supervised release in full, see id. at 32-34. The majority relies for this conclusion chiefly on the passages in the District Court's opinion that praise without qualification the probation officer for his service, see id. at 34, and that question why Frederickson did not tell anyone about his allegation that the officer assaulted him right beforehand, see id. at 33. But, while those statements do provide some support for the majority's characterization of the District Court's reasoning, other statements in the District Court's opinion point against it and prevent me from signing on to the majority's ruling.

For starters, the District Court stated in describing the basis for finding that Frederickson had violated the terms of his supervised release that "[e]ven if [he] believed that [the officer] unlawfully had physical contact with him, [he] used more force than appeared reasonably necessary in the circumstances." (emphasis added). Far from rejecting the credibility of Frederickson's claim that he had been assaulted first, that statement expressly concludes that his manner of attacking the

officer was itself so violent that it constituted a criminal assault no matter what had occurred beforehand.

Several other statements by the District Court then go on to reinforce the impression that it was focused on the especially violent nature of Frederickson's attack, rather than whether he had been victimized in his own right first. The District Court states at one point, for example, that while Frederickson "testified that [the officer] touched him inappropriately one time at the beginning of the encounter," there was "[n]o testimony of any other unlawful contact or that [the officer] responded to the defendant's punch with ongoing unlawful force or contact, and yet [] Frederickson's assault on [the officer] continued." (emphasis added). The District Court then emphasizes at another point that, in its view, there was "additional proof that more force was used than necessary," (emphasis added), namely the extent of the officer's injuries as documented by photographs, his testimony, and his hospital records.

Further, when the District Court states that Frederickson's attack on the officer was "out of the blue," it qualifies that assertion by noting that such a description of the event was "according to" the officer. It thus appears to be relying on a fact that it determined was "frankly . . . undisputed" -- specifically that "Frederickson admitted that he sucker

punched" the officer -- and that in and of itself hardly undermines Frederickson's account of what had been done to him. Additionally, when the District Court states that it "f[ound] [the officer's] testimony about the assault credible by a preponderance of the evidence," it refers specifically to the violence that Frederickson used in attacking the officer and not to what had transpired just before.

Finally, by the time of the revocation decision, a jury had already acquitted Frederickson of the assault at issue after it had been instructed that the government needed to prove beyond a reasonable doubt that Frederickson was not acting in self-defense and after it had heard Frederickson testify that he had been sexually assaulted in the restroom. I agree that the District Court was not bound by that jury's verdict, see United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011), and there are certainly grounds to doubt Frederickson's account. But, I am still hesitant to conclude that the District Court intended to reject without ever expressly saying so a seeming premise of that jury's verdict -- namely, that Frederickson was credible in contending that he had been sexually assaulted immediately prior to attacking the officer. See Dimick v. Schiedt, 293 U.S. 474, 486 (1935) ("Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury

trial should be scrutinized with the utmost care."); United States v. Bell, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of petitions for rehearing en banc) ("[F]ederal district judges have power in individual cases to disclaim reliance on acquitted or uncharged conduct."); United States v. McReynolds, 964 F.3d 555, 565 (6th Cir. 2020) (explaining that the fact that a district court may rely on acquitted conduct at sentencing "is not a greenlight for the district court to do whatever it wants at sentencing regardless of the jury's verdict and without explanation"); cf. United States v. Lombard, 102 F.3d 1, 5 (1st Cir. 1996) ("Certainly situations exist where the sentencing court might persuasively explain the use of acquitted conduct.").

Thus, for these reasons, unlike the majority, I am uncertain whether the District Court settled on the complete revocation of Frederickson's supervised release because it disbelieved his story altogether, because it believed his claim that he had been sexually assaulted while taking the drug test but concluded that his violent response was grossly disproportionate, or because it thought that it was so evident that his violent conduct was of a kind that warranted such a revocation (at least given the evidence of his past violence while on supervised release) that there was no need to make a finding one way or the other as to whether he had been assaulted first or not.

Accordingly, in my view the proper course is to vacate and remand the District Court's revocation decision so that it may clarify the rationale for it and thereby ensure that Frederickson receives the kind of explanation to which he is entitled for this severe punishment.  See United States v. Ofray-Campos, 534 F.3d 1, 43 (1st Cir. 2008) (finding procedural error where the district court's explanation for a significant upward variance was "neither sufficiently particularized nor compelling to survive . . . review for reasonableness").  I therefore respectfully dissent.